360 Mass. 787 (1972)
279 N.E.2d 296
IN THE MATTER OF EDWARD J. DeSAULNIER, JR. & another (No. 4).
Supreme Judicial Court of Massachusetts, Suffolk.
November 15-19, 22-24, 29, 1971.
December 1, 1971.
January 11, 1972.
Present: TAURO, C.J., CUTTER, REARDON, QUIRICO, & BRAUCHER, JJ.
Robert V. Mulkern for the respondent Vincent R. Brogna.
Walter J. Hurley for the respondent Edward J. DeSaulnier, Jr.
Edward B. Hanify, Special Counsel (John M. Harrington, Jr., Special Counsel, with him).
BY THE COURT.
On September 8, 1971, the Chief Justice of the Superior Court filed a petition for the appointment of counsel, stating that he had been engaged in the investigation of "charges and allegations of misconduct of two Judges of the Superior Court." This misconduct was "averred, principally at least, to have taken place with *789 respect to a criminal case in Middlesex County but is not necessarily confined thereto." On the basis of his investigation the Chief Justice of the Superior Court stated his opinion that public interest required prompt presentation of an information to the full court "setting forth allegations concerning the matters investigated" and sought "that a thorough judicial inquiry into such matters be instituted forthwith by the full court in such manner as the full court may hereafter determine." It was stated in the petition that in the public interest and in fairness to all concerned the information should be prepared by independent counsel selected by the full court.
Thereafter, the full court did appoint Edward B. Hanify, Esquire, and John M. Harrington, Esquire, as special counsel. On October 4, 1971, two informations were filed in this court by special counsel, the first against Edward J. DeSaulnier, Jr. and Vincent R. Brogna, and the second against Edward J. DeSaulnier, Jr. alone. The informations and answers thereto are appended as appendices A and B. Since the subject matter of the two informations is distinct, they will hereafter be separately treated.
INFORMATION IN THE MATTER OF EDWARD J. DeSAULNIER, JR. AND VINCENT R. BROGNA.
The first information (Appendix A) sets forth in detail the chronology of events leading to the final disposition of two Massachusetts criminal cases (larcenies) involving Michael Raymond. The representations contained in the information are based primarily on statements made by Raymond and others, official court records, and transcripts. In essence, Raymond stated that in 1962 he made payments to I. Charles Baker, a surety bail bondsman, upon Baker's representation that he could insure a favorable judicial result in Raymond's cases. Baker further stated, according to Raymond, that the arrangement for disposition of his matters was to be made through Judge DeSaulnier. From June of 1962 until the final disposition, Raymond was *790 represented by Mr. Richard G. Crotty of Worcester, who was an intimate social friend of Judge DeSaulnier. Raymond's cases came before Judge Vincent R. Brogna in September, 1962. After several continuances, and after a partial restitution agreement had been reached with the victims of Raymond's larcenies, Raymond was given a suspended sentence and placed on probation. Following his final court appearance on September 28, Raymond and Baker met Judge DeSaulnier in a public place known as the Darbury Room. Raymond's matter was referred to, and Judge DeSaulnier expressed his pleasure in "doing business" with Raymond.
In his answer to the information, Judge DeSaulnier admits knowledge of statements made by Raymond that are the basis of certain paragraphs in the information. He does not dispute the truth of those portions of the information which make reference to the dockets and the official transcripts of the court. He denies any involvement in the Raymond matter and states he has no memory of having ever met or talked to Raymond. He further states that he cannot assist the court as to the accuracy of certain portions of Raymond's testimony. He points out that Raymond has elsewhere made statements in conflict with those set out in the information. As to his relationship with Mr. Crotty, Judge DeSaulnier states that he was socially a friend of Mr. Crotty and became gradually friendlier with him, but that this did not, to his knowledge, bear on Mr. Crotty's employment as counsel for Raymond.
In his answer, Judge Brogna admits awareness of statements made by Raymond that are the basis of certain paragraphs in the information. He does not dispute the truth of those portions of the information which make reference to the dockets and the official transcripts of the court. He denies having had any contact concerning the disposition of the Raymond matters with Judge DeSaulnier, I. Charles Baker (hereinafter called Baker), or Nathan Baker, or any person not legitimately connected with the handling of the *791 cases. He states his handling of the Raymond cases was in the best interests of the Commonwealth and of the parties before him, and that his disposition of them was proper and routine. He further states that he cannot assist the court as to the accuracy of certain portions of Raymond's testimony although he noted that Raymond has elsewhere made statements in conflict with those set out in the information.
FINDINGS OF FACT.
After hearing, and upon consideration of (a) the evidence, (b) admissions in the pleadings, and (c) matters of public record of which we take judicial notice, and after making permissible inferences from the foregoing, we find that the following facts are established by a fair preponderance of the evidence.
1. Edward J. DeSaulnier, Jr., was admitted to the bar of Massachusetts on April 14, 1948, and was appointed an Associate Justice of the Superior Court on December 30, 1958. Vincent R. Brogna was admitted to the bar of Massachusetts on December 10, 1941, and was appointed an Associate Justice of the Superior Court on December 7, 1960. Judge DeSaulnier, who had previously served in the House of Representatives, was a member of the State Senate during 1957 and 1958, and Judge Brogna served as Special Counsel to Governor Foster Furcolo from 1957 to 1960. Because of their respective political positions, we conclude that these two men were acquainted as early as 1957.
2. On November 6, 1961, Raymond was arraigned in the Middlesex Superior Court on indictment No. 57940, charging larceny of approximately $18,000 from Evelyn Lewis. The indictment contained three counts, and was based on Raymond's alleged fraudulent exchange of worthless oil and gas leases for cash and marketable securities owned by Miss Lewis. Just prior to this arraignment, Raymond had completed a sentence in the United States Penitentiary at Lewisburg, Pennsylvania, and had been transferred to the *792 Middlesex County House of Correction. Shortly after arriving at the House of Correction, Raymond retained Mr. James O'Donovan as attorney. Mr. O'Donovan effected a reduction of Raymond's bail from $10,000 to $5,000. Raymond was released upon furnishing a $5,000 surety bail bond executed by Nathan A. Baker, as Attorney in Fact, for the Continental Casualty Company. At that time, and at all material times, Nathan Baker was an intimate social friend of Judge DeSaulnier, and he and his elder brother, I. Charles Baker, were engaged in the business of providing surety bail bonds.
3. Upon his release from custody, Raymond returned to New York where he became involved in certain securities transactions of the Red-O-Lier and the Wavetronics Corporations. Mr. O'Donovan made several attempts to get in touch with Raymond in order to prepare a defence for his Massachusetts case, and in order to collect a fee.
At some time between his release from custody in November, 1961, and May, 1962, Raymond attempted to insure a favorable result in his Massachusetts case by a payment of $10,000 to Stanley Polley of New York, who tried to work through one Nathan Voloshen. This money, however, was returned to Raymond because it was not possible to insure the result sought by him.
4. On May 22, 1962 (all dates hereafter are in 1962 unless otherwise stated), Mr. O'Donovan appeared for Raymond in the Middlesex Superior Court and was granted a continuance until May 25 by Judge Edward A. Pecce. Judge Pecce ordered that no further continuances be granted. Mr. O'Donovan withdrew his appearance on May 24.
5. On May 24, Mr. Paul T. Smith filed his appearance as counsel for Raymond through his associate, Mr. Raymond Dowd. Stanley Polley had been in touch with Mr. Smith and had told him Raymond would be in to see him. Mr. Dowd secured another continuance until May 29. During a May 25 interview with Mr. Smith, Raymond sought to obtain a "guarantee" that he would "hit the street." *793 Mr. Smith replied that the only guaranty he could give him was that he would use his best abilities for him. Not satisfied with this, Raymond left the office. Mr. Smith filed a withdrawal of his appearance on May 28.
6. Raymond next sought the services of Attorney Robert Lombard for the purpose of obtaining a continuance until the fall. This continuance was highly important to Raymond because he was then heavily involved in various stock promotion activities in New York. Mr. Lombard referred him to Mr. James F. Morelli, who did obtain a continuance from May 29 to June 8. Again Judge Pecce ordered that there be no further continuances.
7. At this time Raymond was quite worried about his situation. He had failed to accomplish anything toward insuring a favorable result in his Massachusetts case. After appearing in court with Mr. Morelli on May 29, he went to the office of Baker, who said to him: "Well, you finally got here. You have been all over town, and you have got a serious problem, and you finally came to the right place." Baker assured him that he could secure a continuance for him through the fall, and that he could insure an ultimate disposition that would involve no jail sentence. He said that the matter would have to be handled on a "judge to judge basis." Raymond paid Baker $10,000 to obtain the continuance.
8. On June 8, Mr. Morelli was granted a continuance by Judge Robert Sullivan (the case was put "off the list") on the unsupported oral representation by Mr. Morelli that a key witness was in Canada. This story was contrived by Baker and Raymond.
9. Also on June 8, while in the Middlesex Superior Court, Raymond was arrested on a warrant from the First District Court of Northern Middlesex (Ayer), based on a complaint of larceny of approximately $17,000 from Sylvia Barrows. This complaint was in one count. Bail was set at $20,000. Baker posted the surety bail bond. Raymond appeared again in the Ayer Court on June 9 with Mr. Morelli, and the case was continued until June 23. There is no evidence *794 leading to any suspicion of any impropriety by any of Raymond's counsel up to June 9, 1962.
10. Prior to June 23, a contact was made with Mr. Richard G. Crotty, an attorney, of Worcester and an interview for Raymond was arranged. At that time and at all material times Mr. Crotty was an intimate social friend of Judge DeSaulnier. Mr. Crotty's experience was primarily in the trial of civil cases, and he had never fully tried a criminal case in the Superior Court. On June 18, prior to the interview with Raymond, Mr. Crotty called Mrs. Barrows to ask for information relative to her complaint.
11. Sometime between June 18 and June 23, Baker drove Raymond to Worcester to meet with Mr. Crotty; Baker instructed Raymond to tell Crotty that a member of Raymond's family had gone to school with Judge DeSaulnier. It was during this trip that Baker first told Raymond that Judge DeSaulnier would arrange the disposition of the matter with the sitting judge. Baker "indicated that the judge was capable and influential and could get the job done."
12. At the interview Mr. Crotty told Raymond that he thought very highly of Judge DeSaulnier and "would do anything in his power for him." The Ayer matter alone was discussed at this time, and Mr. Crotty believed that he was then representing Raymond in that matter only. At this meeting Mr. Crotty did not collect the customary retainer because he was told that Raymond had no money.
13. On June 23, Mr. Crotty, Raymond, Sylvia Barrows, her attorney Mr. Ralph Bowmar, George F. Harnois, a State police lieutenant, and Groton Police Chief Elliot P. Clark all met at the Ayer District Court. Mr. Crotty and Mr. Bowmar asked Judge Lyman K. Clark (now deceased) for a delay that they might work out a restitution agreement. They then went to Mr. Bowmar's office. There they reached an agreement providing that Mrs. Barrows would request the Ayer District Court to dismiss the complaint against Raymond in return for installment payments totaling $11,000 by December 19, the last payment date. Judge *795 Clark then continued the case until August 15. Mr. Crotty believed that if Raymond continued to make the payments called for by the restitution agreement he would not be bound over to the grand jury.
14. Pursuant to the restitution agreement, Raymond paid $1,700 in two installments. On August 15, despite the fact that Raymond was complying with the agreement, Judge Clark ordered him bound over. Mr. Crotty made no effort on behalf of his client to prevent this. Raymond paid a third installment of $200 as agreed in the first days of September.
15. On September 7, the Middlesex County grand jury returned an indictment (No. 65677) against Raymond charging larceny from Sylvia A. Barrows.
16. On September 10, indictment No. 57940 was called for trial in the first criminal session of the Middlesex Superior Court presided over by Judge Brogna. Mr. Joseph Neylon, Assistant District Attorney, informed the court that Mr. Morelli intended to withdraw his appearance for Raymond. It was uncertain whether Raymond had been notified to appear that day. Judge Brogna directed the clerk to notify Raymond at his New York address that his case was scheduled for September 17, and that if he did not appear he would be defaulted.
17. On September 11, indictment No. 65677 was called for arraignment. The clerk indicated that Mr. Crotty would be representing Raymond; and, in response to an inquiry from Judge Brogna, he stated that "the bondsman" had given him Mr. Crotty's name. Judge Brogna then directed that Mr. Crotty be called, and continued the case to September 17 for arraignment.
18. On September 17, both criminal indictments against Raymond were on the trial list. Mr. Crotty had notified Raymond through Baker of the September 17 proceedings. Raymond, however, did not attend. Despite Judge Brogna's statement on September 10 that if Raymond did not appear on September 17 he would be defaulted, he was not defaulted *796 when he failed to appear on the 17th. The transcript for the 17th shows no statement by Judge Brogna or by anyone else concerning the entry of a default against Raymond for failing to appear.
19. The only entry in the transcript of September 17 with reference to the Raymond cases is that when they were called Judge Brogna stated, "That's over to the 27th." The transcript for that day discloses no statement whatever on the Raymond matter by any representative of the district attorney's office or by Mr. Crotty. These developments were in marked contrast to the events of September 10 and 11. The transcripts for these dates reveal (1) that the prosecution was strongly opposed to any further continuance of these cases, (2) that Judge Brogna was fully informed of Raymond's tactic of attempting to delay a trial of indictment No. 57940 by changing attorneys, and (3) that he was determined not to tolerate further delays. The transcript for September 17 contains no request by anyone for a continuance of the Raymond cases, but it is clear that trial of indictments charging felonies could not commence without the defendant present.
20. The transcript for September 17 does not indicate that Mr. Crotty was present. However, on that date an appearance was entered in Mr. Crotty's behalf for Raymond in the Lewis matter. Prior thereto he had represented him only in the Barrows matter. Mr. Crotty had received no fee or retainer on either of the two cases. To that date he had had little, if any, communication from Raymond since June 23. In that situation, and despite Raymond's failure to appear for what he had been told was a very important court date, Mr. Crotty filed his appearance in the second case. He testified that before the call of the list on September 17, "somehow or other we got word to ... [Judge Brogna] that I wasn't prepared to go forward." Mr. Crotty wanted a continuance to September 24.
21. The transcript for September 17 contains no statement by Judge Brogna of his reasons for continuing the case to September 27. The latter date was the next to the *797 last day of the September term, a day ordinarily reserved in Judge Brogna's session for cases expected to be disposed of on guilty pleas without trial. This action by Judge Brogna may indicate that he believed the cases would be disposed of without trial. There is nothing in the transcripts of the proceedings to that date which could form the basis for such a belief. The district attorney's office is not shown to have abandoned its consistent attitude of pressing for trial of the indictments against Raymond. The transcript for the 17th does not indicate that the judge called upon the prosecution to state its position on whether Raymond should be defaulted or on the date to which the cases would be continued. To that date Mr. Crotty had not communicated with Miss Lewis to ascertain whether something less than full restitution would be acceptable to her, and he did not do so until September 27. Any basis for Judge Brogna's indicated belief on the 17th that these cases would be disposed of without trial came from something other than any of the stenographically recorded proceedings in the cases.
22. After the September 17 continuance, Mr. Crotty communicated to Raymond, either directly or through Baker, the new date of the trial. Mr. Crotty never attempted to advise Raymond as to the amount of money that might be needed for restitution. Nor did Mr. Crotty seek to work out the details of a restitution agreement with the other parties before the September 27 hearing.
23. Some time in September, Baker called Raymond in New York to urge him to come to Boston at once. Raymond thereupon came to Baker's office in Boston. There Baker told Raymond that "a judge had died and that the next judge that was going to be sitting ... was someone that he could not handle; and he had five or six days to handle, or bring ... [Raymond's] matters to a head." (Judge Jesse Morton, who had been scheduled to sit in the September criminal session in Middlesex, had died on May 21, 1962. In July, 1962, Judge Brogna had been assigned to that sitting as a replacement and was sitting at the time of *798 Baker's telephone call.) Baker and Raymond agreed that within that time Raymond would provide $15,000 for restitution and $35,000 to Baker for a suspended sentence.
During this period in 1962 Raymond was involved in certain financial transactions that enabled him to have access to large sums of money. He had sold stock in Wavetronics Industries, Inc. during the summer of 1962, and this had generated a substantial sum. On or about September 25 he borrowed $30,000 from New York loan sharks. He likewise was the ultimate recipient of $50,000 borrowed from the Bankers Trust Company nominally by one Jerome Naftol, also on September 25. Hence, from these various sources Raymond was able to secure the necessary $50,000 and return to Boston by September 26, at which time he turned over the money to Baker.
24. Raymond accompanied Baker to the Middlesex County Court House on September 27 for the final disposition of his cases. There, they met Mr. Crotty and handed over to him an attache case which then contained $15,850. This marks the first time that Mr. Crotty was aware of the amount of money that would be available to work out a restitution agreement. Mr. Crotty then attempted to work out a settlement, based on that figure, with the representatives of the parties: Assistant District Attorney Neylon, Mr. Bowmar, and Officer Galligan. If restitution could not have been effected, Mr. Crotty was not prepared to try the case. There is no indication that either case could have been successfully defended.
25. During the afternoon of September 27 Raymond was informed that it was necessary that a period of probation accompany his suspended sentence. Because probation would mean supervision over his financial activities, Raymond told Baker that he could not tolerate such a situation and would not agree to it. At that time Baker informed him that the probation could be transferred to New York under the "Mayflower Compact." Thereupon Baker telephoned Judge DeSaulnier who, in conversation with Raymond, impressed *799 upon him the necessity of probation. Raymond repeated to Judge DeSaulnier his objections to probation but said he would call New York to determine whether he could "handle" the supervision in New York. Raymond then called Stanley Polley in New York, who indicated that the probation supervision probably could be rendered ineffectual there. Polley told Raymond to come to New York immediately. Raymond then told Baker to delay the proceeding "until tomorrow" so that he could return to New York.
26. The original stenographic notes for the proceedings on the 27th before Judge Brogna in the First Criminal Session, Middlesex County Superior Court, indicate that there was a luncheon recess from 12:55 P.M. to 2:50 P.M. At 3:10 P.M., Judge Brogna ordered a recess during a witness's testimony in the jury waived case he was hearing. At 3:13 P.M., the recess ended, and the witness resumed testifying. Sometime between 3:20 and 3:30 P.M., after the witness had concluded testifying, Judge Brogna stated: "Before we start with this witness, are you people ready with the Raymond case?" Mr. Crotty replied, "We'd like to approach the bench." The transcript is silent as to what transpired at this bench conference. After this conference the Raymond cases went over to the next day. The transcript shows no request by counsel nor any order by the judge for such a continuance, nor does it include any statement by anyone of the reasons therefor. We conclude that at some time prior to the bench conference Judge DeSaulnier communicated to Judge Brogna his desire for a continuance of the Raymond cases, and the cases and their continuance were the subject of the unrecorded bench conference and of a conference by Mr. Crotty and the prosecuting attorney with Judge Brogna in his lobby earlier on the same day.
27. Back in New York, Raymond met Stanley Polley who arranged through Judge Mitchell Schweitzer, a New York Supreme Court judge, to make ineffective the supervision of Raymond in New York. For this, Raymond paid Polley $20,000, the ultimate disposition of which is not clear to us.
*800 28. Raymond returned to Boston the following day, September 28, and met Baker and Mr. Crotty at the court house. A series of conferences held on September 27 or 28 between Mr. Crotty representing Raymond, Mr. Bowmar representing Mrs. Barrows, and Cambridge police sergeant John F. Galligan representing Miss Lewis resulted in an agreement that Raymond would pay $15,000, of which Miss Lewis would receive $8,000 in full payment and discharge of her claim of $18,000, and Mrs. Barrows would receive $7,000 (in addition to the sum of $1,900 received by her under the Ayer restitution agreement) in full payment and discharge of her claim of $17,000. This was reported to the prosecutor assigned to the case, Assistant District Attorney Neylon, who reported it to his superior, First Assistant District Attorney Richard S. Kelley. With the latter's approval, Mr. Neylon then agreed with Mr. Crotty that if Raymond pleaded guilty the prosecution would recommend that he be given a suspended sentence of three years and that he be placed on probation for three years. Mr. Kelley was responsible for deciding what recommendation the office of the district attorney would make on the disposition of cases. In his initial review of the Raymond case for that purpose he made an entry in the file that the recommendation would be for a sentence of three to five years at the Massachusetts Correctional Institution at Walpole, without suspension of the sentence. That entry continued in effect until the change described above. The proposed restitution was a factor in the change in proposed recommendation.
29. On September 28, after the parties had reached the agreement for restitution and for recommendation of disposition described above, a conference was held with Judge Brogna in his lobby. The persons present in addition to the judge were Mr. Crotty, Mr. Neylon, Mr. Bowmar, Sergeant Galligan and Assistant Probation Officer Walter E. Lawler. Captain (then Lieutenant) Marckini of the Cambridge police who had investigated the Lewis matter did not come to court either on September 27 or September 28 *801 on assurances to him from some source that the cases were going to plea and disposition. Mr. Crotty reported to the judge on the agreement which had been reached by the parties, and also told the judge of the efforts Raymond had made to raise the sum of $15,000. Judge Brogna asked Mr. Bowmar whether Mrs. Barrows was satisfied with the agreement. Mr. Neylon asked Sergeant Galligan the same question concerning Miss Lewis. Both answered in effect that the ladies were satisfied. Miss Lewis had in fact previously expressed the opinion that Raymond should go to jail but she eventually agreed to the proposed restitution. This lobby conference was not recorded stenographically.
30. At the conclusion of the lobby conference described above, all of the participants went to the court room where the court reconvened with Judge Brogna presiding. The indictment charging Raymond with larceny from Mrs. Barrows was called and Raymond pleaded guilty. This was the first time he had been called upon to plead to this indictment. The indictment charging him with larceny from Miss Lewis was called and he retracted his prior plea of not guilty and pleaded guilty. The clerk informed Judge Brogna that Raymond was entitled to a mental examination. G.L.c. 123, § 100, as amended by St. 1956, c. 589, § 7. The judge said: "Have him waive it." Thereupon Raymond orally waived his right to such an examination. Mr. Neylon then called on Sergeant Galligan to state the facts of the larceny from Miss Lewis to the court and he stated them. Mr. Crotty did not cross-examine the witness. Mr. Neylon then called on Lieutenant Harnois to state the facts of the larceny from Mrs. Barrows and he stated them. In answer to two questions put by Mr. Crotty, the witness said that Raymond had given Mrs. Barrows a promissory note bearing interest at one per cent a month. Judge Brogna then asked Mr. Neylon whether he had a recommendation to make. Mr. Neylon then made the recommendation which had been previously agreed upon by the parties and discussed by them with Judge Brogna in the lobby conference. The judge then stated that he had looked at the file and asked whether the amount of the restitution was *802 satisfactory to the victims of the larcenies. Mr. Bowmar and Sergeant Galligan answered that it was. Thereupon Mr. Crotty said: "Your Honor, I accept the recommendation of the District Attorney's Office." Raymond was then sentenced to confinement in the Massachusetts Correctional Institution at Walpole, for a term not exceeding five years nor less than three years on each of the two indictments, the sentences to be served concurrently. The sentences were ordered suspended and Raymond was placed on probation for three years. The only special condition of the probation was that Raymond "make restitution in the sum of $15,000 forthwith." There was no order for additional restitution of any part of the additional amount which he had admitted stealing from Mrs. Barrows and Miss Lewis. There is nothing in the transcript of September 28 to indicate that any inquiry was made in open court before sentence concerning the subject of additional restitution as a condition of probation. After the sentencing Mr. Crotty paid $15,000 in cash to the probation officer who in turn paid it by checks to Mrs. Barrows and Miss Lewis in the agreed amounts upon their signing of the required releases.
31. Mr. Crotty received as his fee for handling Raymond's matters the $850 which was left in the attache case. Indeed, had the full $15,850 been necessary to effect restitution, Mr. Crotty would have foregone any immediate compensation for his legal services.
32. Following the court proceedings on the 28th, Raymond and Baker went to a public place known as the Darbury Room, where they were later joined by Judge DeSaulnier. Judge DeSaulnier made reference to telephone conversations he had had with the sitting judge. He also told Raymond that it was a pleasure doing business with him.
33. Raymond, as the respondents argue, was a swindler and a liar. His story in most essentials has received independent corroboration from other sources which are entirely trustworthy. In general outline it had been told on various past occasions (about which there was testimony) *803 in less complete but substantially consistent fashion.
34. On July 25, 1971, Judge Brogna learned from articles in Boston newspapers that he was the judge who had presided over the Raymond cases and their disposition in September, 1962. On the morning of July 26 he made a number of telephone calls to a number of persons in the office of the Clerk of Courts and of the Probation Officer for Middlesex County to obtain information and copies of records concerning the Raymond cases. On the morning of July 27 he learned the name of the court stenographer assigned to his session of court for the month of September, 1962. He spoke to the stenographer by telephone and asked him to locate his notes on the Raymond cases. The stenographer located them and read them to Judge Brogna at the Suffolk County Court House shortly before noon that day. At the judge's request, the stenographer transcribed the notes and took the transcript to the judge's residence in the late afternoon or early evening of the same day.
35. After hearing the stenographer read his notes, Judge Brogna called Judge DeSaulnier and a judge of a municipal court for a district of Boston. He told each of them what the notes revealed, and invited them to go to his residence late that afternoon when he expected to have a transcript of those notes. The Municipal Court judge in turn called Mr. Monroe Inker, an attorney then representing Baker, told him about the stenographer's notes, and invited him to go to Judge Brogna's residence. At some time between 4:30 and 5:30 P.M. all of the following persons were at Judge Brogna's residence: Judges Brogna and DeSaulnier, the Municipal Court judge, the two Baker brothers, Mr. Inker, and Mr. Joseph Oteri, Mr. Inker's law partner. Judge Brogna told the group what he had done to obtain the records and transcripts on the Raymond cases, and told them of the contents of the transcripts he expected to receive from the stenographer. Shortly thereafter the stenographer delivered the transcripts. In reply to a question by Judge Brogna, one of the Baker brothers said that *804 they had furnished the bail bonds for Raymond and had received a "bad check" in payment for one of the bonds At that time, although Judge Brogna knew that the Baker brothers had been alleged to have paid a bribe in connection with the Raymond cases, he did not ask them or their lawyers any other questions about any other phase of action or participation by the Baker brothers in the Raymond cases.
36. The stenographer and the Baker brothers left shortly after the delivery of the transcripts. The judges and lawyers remained and went over the transcripts and discussed what should be done with them and the information contained in them. They went out for supper and then resumed their discussions at the law offices of Crane, Inker and Oteri, in Boston. The principal topic of discussion was whether Judges Brogna and DeSaulnier should hold a press conference. Mr. Crotty joined the group briefly and expressed the opinion that they should not hold a press conference. The group ultimately decided that no press conference would be held. At the same meeting the group also discussed what should be done to obtain additional information, particularly what should be done to obtain a copy of Raymond's statements before the Senate committee.
37. The group's decision to hold no press conference was reversed by Judge Brogna early the next day, July 28, as the result of receiving telephone calls from a number of reporters asking him for a statement. He called Judge DeSaulnier and told him he had changed his mind and that he was going to arrange a press conference. He then called Mr. Oteri and asked him to arrange a press conference. Mr. Oteri called the Boston television stations and newspaper offices and arranged for the conference to be held. At the conference Judge Brogna made a statement of what he had done. Mr. Oteri participated in the conference. Copies of the transcript of the proceedings in the Raymond cases were distributed to the newsmen present. Judge DeSaulnier did not participate in the press conference.
*805 INFORMATION IN THE MATTER OF EDWARD J. DESAULNIER, JR.
The second information (Appendix B) contains a series of three general allegations. The first of these deals with Judge DeSaulnier's friendship and gambling activities with Nathan A. Baker (the younger brother of I. Charles Baker). It alleges that while the judge was a member of the Bail Committee of the Superior Court, and Nathan Baker was a professional bondsman, Nathan Baker lent money to the judge.
The second general allegation relates to a telephone bill of $216.68, including at least thirty-three long distance calls made by Judge DeSaulnier not on official court business and paid for by the county of Berkshire after approval by him. The information sets forth, thirdly, that a real estate broker's license was issued to Judge DeSaulnier on September 29, 1969, on his application.
Judge DeSaulnier in large part admits the allegations of the second information. He claims that his friendship with Nathan Baker was no more intimate than his friendship with others, and that this friendship did not impede his functioning as a member of the Bail Committee. He further states that no complaint was brought against Nathan Baker while he was a member of that committee.
Relative to the telephone bill, he states that the telephone in question was available to others, including the clerk, probation officer, or any person directed to make a call. He admits the issuance of the real estate broker's license to him as alleged.
We find as follows:
1. On September 3, 1964, the Chief Justice of the Superior Court appointed Judge DeSaulnier as one of the members of the Committee on Bail of the Superior Court. This committee was charged, in part, with the "supervision of professional bondsmen and of the standing commissioners to admit persons to bail, making periodic reports as required to the Court."
*806 2. While Nathan A. Baker was a professional bondsman and Judge DeSaulnier was a member of the Committee on Bail, they were intimate social friends. Baker and Judge DeSaulnier often dined and drank together. They frequented places of entertainment outside the Commonwealth and shared expenses. They also traveled together to Las Vegas, Nevada, on "junkets," trips in which certain hotels forego charges for food, drink and entertainment in the expectation that the guests would wager large sums of money.
3. While Nathan A. Baker was a professional bondsman and Judge DeSaulnier was a member of the Bail Committee, Nathan A. Baker lent money to Judge DeSaulnier.
4. During the month of November, 1970, Judge DeSaulnier presided over the session of the Superior Court for the county of Berkshire at Pittsfield, Massachusetts. On December 14, 1970, Judge DeSaulnier approved for payment by the county, in writing, a bill for the use of the telephone in the judge's lobby in the court house. The amount of the bill was $216.68. The county treasurer had called the attention of the judge to these charges in a polite letter. The bill included charges for at least thirty-three long distance telephone calls made by Judge DeSaulnier which were not related to any official business of the Superior Court. These included two calls to a hotel in Las Vegas, and five calls to the office of Nathan A. Baker and his brother, I. Charles Baker, in Boston.
5. On September 29, 1969, on his application, Judge DeSaulnier was issued a real estate broker's license, No. 66684.
ULTIMATE FINDINGS.
Upon the whole record concerning the first and second informations, and on the basis of our subsidiary findings, we conclude that (1) Judge DeSaulnier and I. Charles Baker conspired to influence the ultimate dispositions of Raymond's *807 cases for a consideration to be paid and, in fact, paid to Baker by Raymond. Judge DeSaulnier received, or expected to receive, some form of consideration or benefit either directly or indirectly from one or both of the Baker brothers for his assistance in the disposition of the Raymond cases; (2) Mr. Crotty represented Raymond at the request of, or in the belief that he was doing a favor for, Judge DeSaulnier. He acted in the belief that if adequate restitution could be effected, it was probable that Raymond would be given no more than a suspended prison sentence. He had no expectation that he would be required to go to trial on the two indictments of Raymond; (3) Judge DeSaulnier, at some time or times in some manner, communicated with Judge Brogna in an attempt to obtain continuances and to influence the disposition of the Raymond cases. Judge Brogna received these communications without objection. The evidence does not permit precise findings concerning the dates, nature, and extent of these communications, or what their influence was. There is no evidence of the receipt by Judge Brogna of any consideration but the evidence raises serious unanswered questions as to the propriety of the disposition and the manner in which the cases were handled by the judge.
On the second information against Judge DeSaulnier alone, we conclude that Judge DeSaulnier's conduct was grossly improper, both as a judge and as a member of the bar.
DISCUSSION AND RULINGS.
1. In an earlier stage of this proceeding we have discussed several bases of our authority to act in this matter. "The power, authority, and jurisdiction of this court to make the inquiry and to hold hearings rest on at least the following grounds, among others: (a) the inherent common law and constitutional powers of this court, as the highest constitutional court of the Commonwealth, to protect and preserve the integrity of the judicial system and to supervise the *808 administration of justice; (b) the supervisory powers confirmed to this court by G.L.c. 211, § 3, as amended; (c) the power of this court to maintain and impose discipline with respect to the conduct of all members of the bar, either as lawyers engaged in practice or as judicial officers; and (d) the power of this court to establish and enforce rules of court for the orderly conduct (1) of officers and judges of the courts and (2) of judicial business and administration." Ante, 757, 758-759.
We now hold that these same sources give us the power and duty as a matter of judicial administration to prevent a judge of an inferior court who has been guilty of serious judicial misconduct from exercising the powers and duties of his office. Of particular impact is G.L.c. 211, § 3, as amended by St. 1956, c. 707, § 1, wherein it is provided: "[T]he justices of the supreme judicial court shall also have general superintendence of the administration of all courts of inferior jurisdiction, ... and it may issue such writs, summonses and other processes and such orders, directions and rules as may be necessary or desirable for the furtherance of justice, the regular execution of the laws, the improvement of the administration of such courts, and the securing of their proper and efficient administration." Such a power has been found to exist in Michigan under constitutional provisions similar to our statutory provision. In re Graham, 366 Mich. 268 (1962). Ransford v. Graham, 374 Mich. 104 (1964). We have already ruled that we may impose discipline on members of the bar who are also judges. See ante, 757, 759.
Our powers of supervision outlined above we propose to exercise with deference to the provisions in the Constitution of the Commonwealth which impose upon the Governor and the General Court primary responsibility for removal of judges. These provisions include Part II, c. 3, art. 1, governing removal by address, and Part II, c. 1, § 3, art. 6, and Part II, c. 1, § 2, art. 8, dealing with impeachment.
*809 It has been argued that this supervision constitutes interference with the independence of the judiciary which the drafters of our State Constitution were so zealous to establish in art. 29 of the Declaration of Rights. It is there stated, "It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit." This court is fully cognizant of its responsibility not to take action to impinge on this freedom so vital to the proper functioning of democracy. But judges who do not abide by those high and well recognized standards of personal and judicial conduct to which they must be held cannot employ the argument of judicial independence as a shield when questionable practices on their part are challenged.
2. What then are these standards? It is unfortunate that we are faced with a case, the first of its type in the history of the Superior Court, in which they must be defined.
Every Massachusetts judge should be aware, as a matter of tradition and instinct, that there exist standards governing his judicial conduct. Some of these standards, such as the duty of honesty, fairness, impartiality, integrity of decision and reasoning, independence, and diligence, hardly need to be stated. These are affirmative standards and duties which, if observed, go far to preserve the courts from scandal or corruption. There has been felt over the years, however, the need of specific definition of what conduct is proper for a judge. In 1924, the American Bar Association adopted Canons of Judicial Ethics prepared by a committee led by Chief Justice William Howard Taft. These Canons merely put into writing what had been accepted earlier. Among other propositions, they stated, "A judge's official conduct should be free from impropriety and the appearance *810 of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach." (Canon 4.) It was further said in those Canons, in part, that a "judge should avoid giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office to persuade or coerce others to patronize or contribute ... to the success of private business ventures.... He should, therefore, not enter into such private business, or pursue such a course of conduct, as would justify such suspicion... nor should he enter into any business relation which, in the normal course of events reasonably to be expected, might bring his personal interest into conflict with the impartial performance of his official duties." (Canon 25.)
In the last few years, an American Bar Association Committee, headed by former Chief Justice Roger J. Traynor of California, has proposed a new set of Canons of Judicial Ethics. These have not yet been officially adopted and, indeed, may be modified to some extent before final approval. Nevertheless, in general direction and content, they indicate the strong consensus within the legal profession that, for the future, judges should be held to more definite and high standards of judicial conduct and private behavior and practices than in the past. The proposed Canons declare (Canon 1) that a "judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of judicial conduct so that the integrity and independence of the judiciary may be preserved." To this end the proposed Canons go on to provide that a full time judge should "refrain from any financial and business dealings that tend to reflect adversely upon his impartiality or integrity, or that interfere with the proper performance of his judicial duties" (Proposed Canon 4 [c] [2]). The proposed Canons also would impose in the future definite restrictions against judges holding offices in business organizations and taking an active role in business *811 management (proposed Canon 4 [c] [1]), and serving as fiduciaries except in family matters (proposed Canon 4 [d]). In these respects, the proposed Canons attempt, by limiting practices not unusual or expressly prohibited in the past, to avoid possibility of reasonable public criticism and misunderstanding.
Proposed new Canon 5 is of particular importance and has special application to the facts before us: "A judge should show respect for and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A judge should not allow his family, social, or business relations or friendships to influence his judicial conduct or judgment. He should not knowingly permit others to convey the impression that they have special influence with him, or lend the prestige of his office to advance a private business interest." The Commentary to this Canon goes on to say that "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges. The judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen, and he should do so freely and willingly."
3. There can be little doubt that, measured by the general standards of new Canon 5, which directly reflect long existing and well recognized principles of judicial conduct, Judge DeSaulnier's conduct as shown by our findings falls far short of promoting "public confidence in the integrity and impartiality of the judiciary."
4. We have mentioned other aspects of the proposed Canons so fully because it was argued to us that Judge DeSaulnier's application for, and possession of, a real estate broker's license did not contravene G.L.c. 212, § 27, as appearing in St. 1969, c. 845, § 3, and did not constitute the practice of law. It was suggested to us also that it was not *812 improper for full time judges to serve as directors of banks and commercial corporations and to engage actively in general business. There is no evidence that Judge DeSaulnier has made any use of his broker's license, but his possession of the license gives an impression of an improper intention to engage for others generally in real estate transactions and activities. Serving as a broker for others for compensation, we hold, would violate the spirit, if not the letter, of § 27. Section 27 provides: "Such [Superior Court] justices shall devote their entire time during business hours to their respective duties and shall not, directly or indirectly, engage in the practice of law."
5. We reach the following conclusions on the basis of G.L.c. 212, § 27, and the various Canons to which we have alluded. Fairly read, the statute contemplates that a Massachusetts full time judge should give full time to his position. This is also the thrust of the Canons. This means that full time judges of any Massachusetts court should not serve as bank directors or directors of other commercial ventures or as real estate brokers. Hitherto it has not been stated officially that judges should not serve as fiduciaries except for the estate, trust or person of a member of his family, and then only if such service will not interfere with his judicial duties. We now express the view that the proposed Canon 4 constitutes a proper guide henceforth for full time judges. In so stating we, of course, exclude activities on charitable boards and the like. In short, when one chooses to become a full time Massachusetts judge he chooses at the same time to sacrifice the potential income to be derived from legal and business activities proper for a lawyer but improper for a judge.
It need hardly be stated that he may not be a social intimate of bail bondsmen whose conduct he is charged with regulating, or that he may not borrow money from them any more than he may from lawyers appearing before him. Furthermore, public gambling and being a judge are completely incompatible.
*813 6. We emphasize what should not need to be stated at all. Any attempt to tamper with a judicial disposition constitutes a vicious attack on the dispensation of evenhanded justice. It does not matter whether the interference comes from a member of the bar, another judge, an elected or appointed official, or from a member of the general public. It does not matter whether it involves a traffic ticket, a probate disposition, or a felony. It was also grossly improper for such communication to have been made, and for the recipient of the communication to have tolerated any approach on such matters even from or in behalf of a friend or brother judge. Any such attempts in the future should be immediately reported by the judge so approached to the Chief Justice of his court.
7. At the observation of the centennial of the Superior Court in 1959, by which time 164 judges had served that court throughout a century without a breath of scandal, reference was made to the requirement of the Massachusetts judge as stated by Rufus Choate at the Constitutional Convention in 1853. Said he, "He must possess the perfect confidence of the community, that he bear not the sword in vain."[1] This has been the tradition in Massachusetts. We intend to keep it so.
8. In the light of the above findings and discussion we rule as follows:
1. Judge DeSaulnier's conduct in the Raymond case (the subject of the first information) and his admitted conduct, both in personal associations and activity as charged in the second information (particularly his conduct in borrowing money from a bondsman whom it was his duty to supervise), have made him unfit to continue either as a judge or as a member of the bar. It is therefore ordered as a matter of judicial administration that he shall not exercise the powers and duties of a Superior Court Judge until further order of *814 this court, and that a separate order of disbarment shall be entered.
2. Judge Brogna's activity in connection with the Raymond cases deserves and requires censure. We do hereby censure him.
3. Some aspects of Judge Brogna's conduct in July, 1971, after he was identified in the press as the judge who presided over the Raymond cases, call for attention. He had the unquestioned right to gather whatever information was available on the cases. In the circumstances existing on July 28, 1971, it was appropriate for him to release to the press a copy of the stenographic transcript of the court proceedings in the cases. We consider, however, the holding of a press conference like that in fact held on that date to be of highly questionable propriety on the part of all participants.
4. The entire record of the proceedings, together with the transcript of testimony, is to be transmitted to the Governor and the General Court for such action as may be deemed appropriate.
So ordered.

*815 APPENDIX A.
COMMONWEALTH OF MASSACHUSETTS SUPREME JUDICIAL COURT FOR THE COMMONWEALTH

INFORMATION
. . . . . . . . . . . . . . . . . .
 .
Edward J. DeSaulnier, Jr. .
Vincent R. Brogna .
. . . . . . . . . . . . . . . . . .
To The Honorable The Justices of The Supreme Judicial Court:
Edward B. Hanify and John M. Harrington, Jr. in accordance with the order of this Honorable Court of September 8, 1971, respectfully inform the Court that:
1. Edward J. DeSaulnier, Jr. was admitted to the Bar of Massachusetts on April 14, 1948.
2. Edward J. DeSaulnier, Jr. was, on the 23rd day of December, 1958, appointed by his Excellency the Governor with the advice and consent of the Executive Council an Associate Justice of the Superior Court and on December 30, 1958 took and subscribed to the required qualifying oaths.
3. He has been an Associate Justice of the Superior Court from December 30, 1958 to the date of the filing of this Information and now holds said office.
4. Vincent R. Brogna was admitted to the Bar of Massachusetts on December 10, 1941.
5. Vincent R. Brogna was on the 6th day of October, 1960 appointed by his Excellency the Governor with the advice and consent of the Executive Council an Associate Justice of the Superior Court and on December 7, 1960 took and subscribed to the required qualifying oaths.
6. He has been an Associate Justice of the Superior Court from December 7, 1960 to the date of the filing of this Information and now holds said office.
7. On December 8, 1959, an indictment, No. 57940, was returned in Middlesex County charging one Michael Raymond with larceny. Said indictment contained three counts. It was based on the alleged swindling by Raymond of Evelyn Lewis of Cambridge, in the exchange of marketable securities owned by Miss Lewis and cash for worthless and fraudulent oil and gas leases. The amount involved was approximately $18,000.
8. At the time of said indictment in the Middlesex Superior Court, Raymond was serving a sentence of three years which had been imposed on June 18, 1959 by the United States District Court for the Southern *816 District of New York on an indictment for transporting stolen securities in interstate commerce in violation of Title 18, § 2314, United States Code.
9. At the expiration of this Federal sentence, said Raymond was returned to Middlesex County and on November 6, 1961, was arraigned on indictment No. 57940. He pleaded not guilty and, not recognizing the bail set, was committed to the Middlesex House of Correction.
10. At all times material hereto, one Nathan A. Baker of Boston and his elder brother, I. Charles Baker, were engaged in business together in providing surety bail bonds.
11. At all times material hereto, said Nathan A. Baker was an intimate social friend of Mr. Justice DeSaulnier.
12. On November 21, 1961, Raymond was released on bail upon the furnishing of a surety bond in the sum of $5,000 executed by Nathan Baker, as Attorney in Fact, for the Continental Casualty Company.
13. Charles Baker and Nathan Baker both participated in the arrangements to provide bail for Raymond on November 21, 1961.
14. Mr. Charles Baker subsequently received as collateral a confession of judgment dated 30 November 1961 in the Supreme Court of the State of New York, County of Kings, running to him from Sadie S. Raymond, the mother of Michael Raymond.
15. Mr. Charles Baker received a check of Sadie Raymond payable to him in the sum of $625 in payment of the premium on said surety bond and for the Bail Commissioner's fee which had been advanced by the Bakers. The said check was returned marked insufficient funds.
16. On November 20, 1961, James O'Donovan had filed his appearance for Raymond in No. 57940. When No. 57940 was called for trial on May 22, 1962 it was continued by the Court until May 25, 1962.
17. Mr. O'Donovan withdrew his appearance on May 24, 1962.
18. On May 25, 1962, Paul T. Smith, by Raymond Dowd, filed his appearance for Raymond in No. 57940. The case was continued until May 29.
19. On May 28, 1962, Paul T. Smith filed a withdrawal from the said case.
20. On May 29, 1962, James Morelli filed his appearance for Raymond in No. 57940 and obtained a continuance until June 8.
21. Mr. Raymond states that in the spring and summer of 1962 he was engaged in certain securities and business transactions with respect to certain corporations named Wavetronics, Inc. and Red-O-Lier Corp. which he expected to be extremely profitable to himself and which he planned to have consummated in November or December of 1962. He states that he was particularly interested in having his Massachusetts case continued until late 1962.
22. Mr. Raymond states that prior to May 29, 1962, he had paid money to certain persons in New York in an attempt to obtain, through the intervention of an elected official, a continuance of the indictment then pending against him in Massachusetts. Mr. Raymond states that the money had been returned to him prior to May 29, because the result could not be accomplished.
*817 23. Mr. Raymond states that when he sought to retain the services of Paul T. Smith, he asked Mr. Smith if a favorable disposition of the indictment then pending against him could be "guaranteed", and he was informed by Mr. Smith that Mr. Smith could not "guarantee" any result, but would render his best services as a capable attorney.
24. Mr. Raymond states that because of the circumstances set forth in paragraphs 21, 22 and 23, he was extremely anxious and despondent about his predicament in the pending criminal proceedings in Massachusetts. Mr. Raymond states that he visited the offices of Charles and Nathan Baker on May 29, after his appearance in Court, and that Charles Baker said, in substance, that if he wanted his case taken care of, he had come to the right place; that there were preliminary discussions as to arranging for a disposition of his case on terms acceptable to Raymond, and that he was asked for $10,000 to ensure the continuance of the case until November or December of 1962. Mr. Charles Baker denies that any such conversation occurred.
25. Mr. Raymond states that a few days subsequent to May 29, he paid Charles Baker $10,000. Mr. Charles Baker denies this.
26. On June 8, Indictment No. 57940 was called in Court. Mr. Morelli appeared for Mr. Raymond; and, on Mr. Morelli's representation that a witness vital to the defense was in Ontario, Canada, obtained a general continuance of the case. This continuance was granted for apparent good cause, and there is no suggestion from any source that the continuance was obtained through any improper influence.
27. On June 8, Mr. Raymond was taken into custody in Middlesex Superior Court on a warrant which had been issued in 1958 by the Ayer District Court on the complaint of one Sylvia S. Barrows for larceny. The Complaint was based on the alleged swindling by Raymond of Barrows in exchanging securities and cash for fraudulent oil ventures. The amount involved was approximately $17,000.
28. On June 8, 1962, Mr. Raymond was released on bail in Ayer upon the furnishing of a bond for $20,000 of the Continental Casualty Company signed by I. Charles Baker, Attorney in Fact. Raymond furnished no collateral for this bond at the time it was furnished. Mr. Charles Baker subsequently received as collateral a confession of judgment running to him from Sadie S. Raymond in the amount of $5,000 in the Supreme Court of the State of New York, County of Kings, dated June 27, 1962.
29. On June 9, 1962, Mr. Morelli appeared for Mr. Raymond in the Ayer District Court. Mr. Raymond pleaded not guilty, and the case was continued to June 23, 1962.
30. Mr. Raymond states that on various occasions during the summer of 1962, he discussed the disposition of his case or cases with Charles Baker and was told by Charles Baker that the arrangement for disposition of his matters was to be made through Judge DeSaulnier, and that the Judge liked cash. Mr. Charles Baker denies this.
31. Between June 9 and June 18, Mr. Raymond retained as counsel, Richard G. Crotty of Worcester. Mr. Crotty, whose experience was predominantly *818 in the trial of civil cases, did not specialize in criminal cases, and had never fully tried a criminal case in the Superior Court.
32. At all times material hereto, Mr. Crotty was an intimate social friend of Mr. Justice DeSaulnier. Mr. Crotty was at least casually acquainted with the Bakers.
33. Mr. Raymond states that he was sent to Mr. Crotty by Mr. Charles Baker. Mr. Crotty does not dispute that Mr. Raymond was sent to him by one of the Bakers. The Bakers deny that they sent Mr. Raymond to Mr. Crotty.
34. Mr. Raymond states that Charles Baker told him to tell Mr. Crotty the story that he was coming to him because Mr. Raymond's father and Judge DeSaulnier were college friends. Charles Baker denies this. Raymond states that he told Mr. Crotty the story suggested, and that Mr. Crotty told him he knew from Judge DeSaulnier that he was coming. Mr. Crotty denies both aspects of the alleged conversation.
35. On said June 23, in the Ayer District Court, a restitutionary agreement was executed between Mr. Raymond and the complainant, Mrs. Barrows, providing for an aggregate payment of $11,000 as follows: $1,500 on June 23, 1962, 5 monthly payments of $200, in August, September, October, November and December, and a final payment of $8,500 on December 19, 1962. Pursuant to this agreement, Mrs. Barrows' attorney, one Ralph B. Bowmar, received on her behalf, $1,500 in June 1962, and two more monthly payments, each of $200, in August and September 1962.
36. On June 23, 1962, in the Ayer District Court, the case was continued until August 15.
37. Despite the existence of the agreement of restitution, and Raymond's compliance with it, on August 15, 1962, Mr. Raymond was "after hearing" bound over to the Grand Jury by the Ayer District Court. Neither Mr. Crotty, Mr. Raymond, Mr. Bowmar nor Mrs. Barrows have any recollection of being present in the Ayer District Court on August 15, 1962.
38. On September 4, 1962, an indictment, No. 65677, was returned against Mr. Raymond in Middlesex County, charging larceny from Sylvia S. Barrows. This indictment contained one count.
39. On September 10, Indictment No. 57940 against Raymond (the first Middlesex indictment of December 8, 1959) was called, and in the absence of counsel, continued to September 17. At this call of the case, Mr. Morelli, whose appearance was still on record for Raymond, did not appear but the Court was advised by Mr. Neylon, Assistant District Attorney, that Mr. Morelli had requested him to advise the Court that it was his intention to withdraw his appearance. Mr. Justice Brogna presided at this session of the Court, and directed that Raymond be notified at his New York address, directed to appear on September 17, and advised that failing this appearance, he would be defaulted.
40. On September 11, Indictment No. 65677 against Raymond (the second Middlesex indictment of September 4, 1962) was called and continued for arraignment to September 17. In this case, there was reference *819 to Mr. Crotty, as counsel for Raymond, although Mr. Crotty did not appear in person. Mr. Justice Brogna, presiding at this session of the Court, inquired of the representative of the District Attorney's office, "How did you get Crotty's name?", and was advised, "The bondsman was in here yesterday. He is going to get in touch with Crotty.". The Court directed that Mr. Crotty be advised that the case was continued until September 17 for arraignment. (See transcript of these proceedings attached hereto and marked "A".)
41. In the court papers pertaining to Indictment No. 57940, there is an appearance slip signed by Richard G. Crotty as counsel for the defendant Michael Raymond. It bears the stamp of the Clerk's office as being filed on "SEP 20, 1962", but the stamp date is written over by a handwritten date "9/17/62".
42. Mr. Crotty received a card from the office of the District Attorney notifying him that the case of Commonwealth v. Raymond would be called for arraignment on Tuesday, September 11. (This card obviously refers to the second Middlesex indictment No. 65677.) At some time, Crotty crossed out this date on the card and wrote the words, "Now Thurs. 9/27". The card also bears the notes in Crotty's handwriting, "Baker Charles Baker Boston".
43. On September 17, 1962, when Indictment No. 57940 was called, Mr. Justice Brogna stated, "That is over to the 27th". It appears that Indictment No. 65677 was similarly continued. (See transcript pages of September 17 attached hereto and marked "B".) There is nothing of record to show that these continuances were sought by counsel. Mr. Crotty's records do not show that he was in court on the Raymond case that day.
44. Mr. Raymond states that between September 17 and 27, he was called on the telephone by Charles Baker and told that his case had to be disposed of in September, that a Judge had died, and that he should come to Boston immediately. Mr. Raymond states that he came to Boston during this interval and was told by Charles Baker that he had 5 or 6 days to come up with $50,000 or else Baker would give him back the $10,000 which he had previously received and "call it quits". Raymond states that Baker explained the urgent time interval on the basis that one Judge had died, and the Judge coming into the session after September, was one who could not be handled. Mr. Charles Baker denies that any such telephone call or conference occurred.
45. Mr. Justice Morton to whom the September criminal session in Middlesex had been assigned, had died on May 21, 1962, and Mr. Justice Brogna had, on July 5, 1962, been assigned to that session. The annual schedule of assignments of Justices of the Superior Court is not given publicity, and the fact that a deceased Judge had, in advance of his death, been assigned to a particular session did not ordinarily come to the attention of persons having no official relationship to the Court.
46. On September 25, 1962, one Naftol of New York borrowed $50,000 from the Bankers Trust Company of New York, in New York City, and turned the proceeds of the loan over to Mr. Raymond.
*820 47. On September 25, 1962, one Edward Bobick of New York, acting for others, provided Raymond in New York City with $30,000, the proceeds of a loan which was to be repaid on November 26, 1962, the repayment to be in the amount of $39,000.
48. Mr. Raymond states that he turned over to Charles Baker on September 26 or September 27 in Boston either $35,000 or $50,000 in cash. Baker denies this.
49. Mr. Raymond states that Mr. Charles Baker told him before going to Court on the 27th that he was to receive a "suspended sentence". Mr. Baker denies this.
50. On the morning of September 27, both Raymond cases were called and stood for "examination". ("Examination" refers to a procedure in which defendant's counsel explores with the District Attorney or his representative the latter's probable recommended disposition of the case.)
51. Mr. Raymond was present in the Middlesex Superior Court House during the whole court day on September 27 and in the afternoon on September 28. He or Mr. Crotty had in their possession during the 27th and 28th at least $15,000 in currency. Mr. Crotty confirms this.
52. Mr. Raymond states that Mr. Charles Baker was with him at all times when he was in Court on September 27 and 28. Mr. Crotty confirms that Mr. Charles Baker was in Mr. Raymond's presence throughout the 27th and was present at the time of disposition on the 28th. Mr. Charles Baker denies that he was present except for a short time.
53. At some point on September 27, there was an agreement between the Office of the District Attorney for Middlesex County, Mr. Crotty and Raymond, and Mr. Ralph Bowmar, counsel for Mrs. Barrows, and a Cambridge police officer present with respect to the indictment of larceny from Mrs. Lewis, that Mr. Raymond would make restitution in the amount of $15,000 and that the recommended sentence would be a suspended sentence with probation.
54. Mr. Raymond states that he was extremely desirous of obtaining a disposition which did not involve probation, that he regarded a sentence with probation as not in accordance with his arrangement with Baker, and that he felt that a supervised probation would interfere with certain transactions in New York from which he expected to gain extremely handsome profits. Mr. Crotty confirms that Mr. Raymond expressed to him his desire not to be put on probation.
55. Mr. Raymond states that on September 27, 1962, he and Mr. Charles Baker participated in telephone calls made from the Middlesex Superior Court to a third person wherein the disposition of Mr. Raymond's case was discussed, and wherein Raymond sought a continuance from September 27 to September 28, in order that he might go to New York and arrange that any supervision of his probation in New York would be ineffective. Mr. Charles Baker denies any such telephone calls.
56. Mr. Raymond states that Mr. Charles Baker informed him at the time of said telephone conversations that he was speaking with Mr. Justice DeSaulnier, and Mr. Raymond states that the person so identified *821 by Mr. Baker told him that he would arrange with the Judge sitting in the session to continue the case one day.
57. In the middle of the afternoon on September 27, the following event occurred in Mr. Justice Brogna's session during the trial of an unrelated criminal case. "THE COURT: Before we start with this witness, are you people ready with the Raymond case? MR. CROTTY: We would like to approach the Bench. [Bench conference on Raymond case]". Mr. Crotty states that he was ready to dispose of the case on the 27th, and that he did not ask to have it go over to the 28th. The Raymond cases were, as the court papers and docket entries show, continued from September 27 until September 28. Raymond states that he used the interval between the court proceedings on September 27 and the afternoon of September 28 to go to New York, and arrange, through a bribe to a Justice of the Supreme Court of that state, to have his prospective probation rendered ineffective as a supervision of his planned activities, and having taken this step, he thereafter returned to Massachusetts in time for the proceedings in Middlesex Superior Court which disposed of the indictments pending against him, on the afternoon of Friday, September 28.
58. The disposition of the indictments pending against Mr. Raymond was held on the afternoon of Friday, September 28, as shown by the transcript attached to this Information and marked "C". The transcript shows that after Raymond had pleaded guilty to each indictment, the Court directed that Raymond waive mental examination, which he did, and that the Court, in accordance with the recommendation of the Assistant District Attorney, sentenced Raymond on each offense to 3 to 5 years in the Massachusetts Correctional Institution in Walpole, and that each of those sentences was to be served concurrently and were suspended, Raymond to be placed on probation for 3 years, and that restitution in the aggregate sum of $15,000 be made forthwith. The transcript shows that prior to the imposition of sentence, the Court was informed that the amount of restitution was satisfactory to the complainants, and that Mr. Crotty informed the Court that he accepted the recommendation of the District Attorney's office. Raymond, immediately after sentencing, paid $15,000 in currency to the Probation Office, which distributed the agreed upon amounts to the complainants.
59. Mr. Raymond states that in the afternoon or early evening of September 28, subsequent to the court session, he, in the company of Charles Baker, met Justice DeSaulnier in a restaurant and bar in Boston. On that occasion, he had a conversation during which Raymond's matter was referred to, and Mr. Justice DeSaulnier, in substance, said to Mr. Raymond it was a pleasure to do business with him. Mr. Charles Baker denies that there was any such meeting, and denies that any such conversation ever occurred.
60. The records of Mr. Crotty's firm show for October 1, 1962, receipt of $850 for the Raymond matter, of which $835 was credited to services and $15 to expenses.
61. The supervision of Mr. Raymond's probation was transferred to *822 New York State pursuant to an interstate compact then in effect, the letter of acceptance from the Chief Probation Officer, Queens County Court, Long Island City, being dated November 16, 1962.
62. On two occasions in 1963, the Queens County Court Probation Department reported in detail that Mr. Raymond was an unsatisfactory probationer and that his supervision was virtually impossible, and on the second of said occasions, October 17, 1963, said Probation Department questioned the purpose of its continued interest in this case, considering the restitution that had already been made, and asked the Chief Probation Officer of Middlesex County for an evaluation of the situation and to be advised accordingly.
63. On October 21, 1963, it was ordered by the Middlesex Superior Court, upon review of the probation record, that New York State should be relieved of its responsibility to supervise and such notification was transmitted and it was ordered that Raymond's probation be continued to its expiration date without further supervision.
64. On April 13, 1964, the Middlesex Probation Office was informed by the Chief U.S. Probation Officer, United States District Court for the Southern District of New York, that Raymond had been arrested in New York on February 27, 1964 by Federal authorities and charged with interstate transportation of forged securities.
65. On April 29, 1964, the defendant Michael Raymond was defaulted in case Nos. 65677 and 57940, and an endorsement was made at the direction of Mr. Justice DeSaulnier that a capias was to issue, and held in the court papers. This directive was given to the probation officer who made a memorandum of it, but apparently did not come to the attention of the Clerk's office with the consequence that no capias was ever drawn or issued, and no further court action was taken in the two Raymond indictments.
66. On July 21 and July 22, 1971 Mr. Raymond, under the name of George White, testified under oath in public at a hearing before the Permanent Subcommittee on Investigations of the Committee on Government Operations of the United States Senate in Washington, D.C. and in said testimony made certain references to the matters which are set forth in the preceding paragraphs of this Information.
Pursuant to the Order of this Honorable Court dated September 8, 1971, the undersigned call the attention of the Court to the foregoing matters for such proceedings and action as the Court may deem meet and just in the premises.
 EDWARD B. HANIFY.
 JOHN M. HARRINGTON, JR.
*823 TRANSCRIPT "A"
Hearing in the case of Commonwealth v. Michael Raymond, Middlesex County No. 65677, September 11, 1962, Brogna, J., presiding:
THE CLERK: 65677, Michael Raymond. Mr. Crotty.
That's the bird yesterday. Michael Raymond.
MR. LAWLOR: This is the one 
MR. NOONAN: Your Honor, I believe that went off. I think they are trying to get Mr. Raymond down here from New York for the 17th. We have to get in touch with the attorney.
THE COURT: Well, let me look. That was the one on the arraignment list.
MR. LAWLOR: The district attorney should get in touch with him right away.
THE COURT: You were going to write to the fellow in New York?
MR. NOONAN: Yes, sir.
THE COURT: How did you get Crotty's name?
MR. NOONAN: The bondsman was in here yesterday. He is going to get in touch with Crotty.
THE COURT: Crotty from Worcester?
MR. NOONAN: Yes, your Honor. If Raymond doesn't come down here for the 17th, the attorney will be here. We are setting that up for the 17th.
THE COURT: Is Crotty going to represent him? This is the fellow who has had four or five 
MR. NOONAN: As far as we know. He's had six or seven attorneys.
THE COURT: Telephone him and tell him I asked you to call him.
THE CLERK: Continue, September 17 for arraignment.
TRANSCRIPT "B"
57940, Michael Raymond. Mr. Crotty.
THE COURT: That's over to the 27th.
THE CLERK: Continued, September 27.
THE CLERK: Raymond case continued, September 27.
*824 TRANSCRIPT "C"
Hearing in the case of Commonwealth v. Michael Raymond, Middlesex County Nos. 57940 and 65677, September 28, 1962, Brogna, J., presiding; Joseph Neylon, Assistant District Attorney, appearing for the Commonwealth; Richard G. Crotty, Esq., appearing for the defendant:
THE CLERK: 65677, Michael Raymond. Waive the reading, sir?
MR. CROTTY: Yes.
THE CLERK: Counsel waives the reading of this indictment.
What say you, Raymond, are you guilty or not guilty?
DEFENDANT RAYMOND: Guilty.
THE CLERK: Guilty, and Commonwealth moves for sentence.
57940, do you desire at this time to retract your plea to this indictment and each count; what say you, sir?
MR. CROTTY: He does. He now changes his plea.
THE CLERK: Have him plead, sir.
DEFENDANT RAYMOND: Guilty.
THE CLERK: Guilty, this indictment and each count, and Commonwealth moves for sentence.
He has a right to a mental examination.
THE COURT: Have him waive it.
THE CLERK: Michael Raymond, you have a right to a mental examination. Do you desire to have that examination or do you waive it?
DEFENDANT RAYMOND: Guilty.
THE CLERK: Waived in open court and so noted.
EXAMINATION BY MR. NEYLON:
Q. Will you indentify yourself to the Court, please?
A. John F. Galligan, Cambridge Police Officer.
Q. Are you familiar with the facts relative to the instant charges of larceny so far as the Cambridge larcenies are concerned?
A. I am.
Q. Would you report those facts to the Court, please?
A. I will. Your Honor, back in the early part of 1959 we received a complaint at the Cambridge police headquarters of this woman who had been swindled out of stocks and cash to the total of approximately $13,000.
After our investigation, your Honor, we found out that the defendant went to this woman's house and after he mentioned the name of a broker from New York who she knew, he had gained confidence with her, and after three or four visits he went there on March 12th of '59 and she passed over 150 shares in stocks and $2,500 in cash. He went there again on March 19th, and she passed him $4,600 in cash and stocks. And again on May 5th, your Honor, it was a hundred dollars in cash and a hundred shares. The total amount was around $18,000, your Honor.
In return she was supposed to get gas and oil leaseholds from Ontario. She never received any of these, your Honor. She contacted *825 him two or three times, and he promised that he'd send them to her but she never received them.
MR. CROTTY: I have no questions.
[Witness excused.]
EXAMINATION BY MR. NEYLON:
Q. Would you identify yourself to the Court, please?
A. George F. Harnois, Detective-Lieutenant, Mass. State Police.
Q. Are you familiar with the facts relative to the instant charges of larceny against this defendant Michael Raymond so far as the Groton case is concerned?
A. Yes, sir.
Q. Report the facts to the Court, please.
A. As a result of a complaint made by a lady from Groton concerning some losses of stocks she had made, the investigation showed that this defendant came to her house on five occasions between April and December 1957. He represented himself as the vice president of Continental Investment Company from New York. He told her that he had some good land oils out in Oklahoma and Toches Parish, advised her it would pay her a good return.
During that year she delivered to him stocks to the total of ten thousand-and-some-odd dollars. He later came back and obtained another total of $700 to drill wells on this property. Our investigation showed that there were two wells sunk on this property out there in 1951 and both were dry wells, and at the present time when this was done according to the department in Louisiana who handles those things there was no oil on that land.
That was the sum and substance.
Q. What was the total amount involved?
A. Around $17,000.
EXAMINATION BY MR. CROTTY:
Q. On the $7,000, that was on a promissory note?
A. That's correct.
Q. Where the complainant was to get one per cent interest per month?
A. That is correct.
MR. CROTTY: I have no further questions.
MR. NEYLON: That's all.
 [Witness excused.]
THE COURT: Your office have a recommendation?
MR. NEYLON: Yes, your Honor. There has been representation by defendant's counsel here that he is ready and able at the present time to make restitution in a total amount of $15,000 forthwith. On that particular promise, our recommendation would be that an order be entered against the defendant to make that restitution forthwith to the two victims and that he be sentenced to Walpole State Prison for a term of *826 three to five years, which we suggest be suspended on a condition that he be placed on probation for a period of three years.
THE COURT: I have looked at the file. This, I understand is satisfactory; that is, the amount of the restitution to the people who were the complainants. Is that your understanding?
MR. NEYLON: That representation has been made. One of the victims has an attorney present, Mr. Bowmar.
MR. BOWMAR: To my client that is satisfactory.
THE COURT: The police officer, I understand, has some information on that. That's satisfactory?
OFFICER GALLIGAN: It is, your Honor.
MR. CROTTY: Your Honor, I accept the recommendation of the District Attorney's Office.
THE CLERK: 57,940, 65,677, Michael J. Raymond, you will harken to the sentences the Court has awarded against you. The Court, having duly considered your offenses, orders that you be punished by confinement in the Massachusetts Correctional Institution, Walpole, for terms of not exceeding five years or less than three years. Each of these sentences are to be served concurrently and are now suspended.
Ordered by the Court you be placed on probation for three years, that you recognize to the Commonwealth of Massachusetts the sum of one hundred dollars with Mr. Walter E. Lawlor as your surety, that you will keep the peace and be of good behavior for a period of three years; and it is further ordered by the Court that you make restitution in the sum of $15,000 forthwith.
Do you so recognize and agree?
DEFENDANT RAYMOND: I do.

*827 COMMONWEALTH OF MASSACHUSETTS

Supreme Judicial Court for the Commonwealth
 SUFFOLK, SS. Law # 14927

In the Matter of

EDWARD J. DESAULNIER, JR.

and

VINCENT R. BROGNA

Respondents

ANSWER AND FURTHER INFORMATION OF THE RESPONDENT BROGNA
To the Honorable the Justices of the Supreme Judicial Court:
Whereas on October 5, 1971 special Counsel to this honorable Court filed with the Court a certain Information designating Vincent R. Brogna, Justice of the Superior Court as a joint Respondent, the said Vincent R. Brogna now, without waiving his "Motion to Dismiss" and "Plea to the Jurisdiction" filed herein, but expressly relying thereon, respectfully makes answer and further informs the Court as follows:
(corresponding Paragraphs in the Information are noted in parenthesis)
1. (1-6) Paragraphs 1 through 6 of the Information are true statements. This the Respondent knows of his own personal knowledge with respect to Paragraphs 4 through 6, relating to his admission to the Massachusetts Bar, and appointment to the Superior Court.
2. (7) Paragraph 7 of the Information is to the best of the Respondent's information and belief true. The record indicates that Respondent, on September 28, 1962, heard testimony from one John F. Galligan, Cambridge Police Officer, relative to the swindle referred to in Paragraph 7. The record further shows that the said Michael Raymond pleaded guilty to the three Count indictment.
3. (8-10) Respondent agrees that the Allegations of Paragraphs 8 through 10 are true.
4. (11) Respondent has no personal knowledge of the extent of any social relationship between Nathan A. Baker and Justice DeSaulnier.
5. (12-38) The Respondent, with respect to these Paragraphs, can only state that, having been provided with certain transcript material, he is aware that there has been testimony and reported interviews in which the allegations of the Paragraphs are reported. Apart from references to the docket of the Court and the official Transcript of the Court, the truth of which he does not dispute, he cannot assist the Court as to the accuracy, veracity or reliability of that testimony, other than to inform the Court that on other occasions in the reported testimony of Michael Raymond he has made statements which are in conflict and inconsistent with the matters contained in these paragraphs.

*828 6. (39) The Respondent admits the general accuracy of the matters contained in Paragraph 39 and further informs the Court that the official Transcript for September 10, 1962 reflects that Raymond, not having appeared on that date, Judge Brogna ordered a default and capias. That upon being advised by the Assistant District Attorney that Raymond may not have been notified, he then, at the suggestion of the Commonwealth, continued the case to September 17, 1962 with the direction that a default would then issue upon failure of Raymond to appear. (see Transcript attached and marked "I")
7. (40) The Respondent admits the accuracy of the official Transcript referred to in Paragraph 40 and marked "A" in the original information.
8. (41) The Respondent respectfully informs the Court that Judge Brogna ordered that Attorney Crotty be notified to appear on September 17, 1962 (see Appendix (A) of original Information) and that Attorney Crotty testified that he was present in Court on that date. He further informs the Court that Attorney Crotty has testified that he first filed an appearance in behalf of Raymond at the Middlesex Superior Court on September 17, 1962. A copy of the appearance is attached hereto and marked "I A". The handwritten date was placed thereon by Assistant Clerk Harold Lyons.
9. (42) The Respondent can furnish little assistance with reference to the matters referred to in Paragraph 42 other than to attach a copy of the card marked "II".
10. (43) The Respondent admits the accuracy of the official Transcript marked "B" in the original Information; however, he respectfully informs the Court as follows:
(a) Attorney Crotty had been ordered to appear on September 17, 1962;
(b) That Attorney Crotty has testified that he was present without his client in Court on September 17, 1962, and that
(c) until September 17, 1962 he was unaware that Judge Brogna was sitting in that First Criminal Session, and that
(d) he went to Court on that date for the sole purpose of seeking a continuance having just been retained on Indictment #57940, and that
(e) before the call of the criminal list on that date he either saw Judge Brogna in the lobby or he saw the Clerk and the Clerk saw Judge Brogna, or he saw the Assistant District Attorney and the Assistant District Attorney saw Judge Brogna, and that
(f) the request for a continuance had been granted prior to the call.
11. (44) The Respondent cannot assist the Court as to the accuracy, veracity or reliability of the purported conversations between Raymond and Charles Baker other than to inform the Court that on other occasions in the reported testimony of Michael Raymond, *829 he has made statements which are in conflict and inconsistent with the statements attributed to him in Paragraph 44.
12. (45) The Respondent admits the truth of the matters contained in the first sentence of Paragraph 45 and further informs the Court that:
(a) Judge Brogna was assigned to and did sit in the Second Middlesex Criminal session (the only felony session) throughout the entire month of June 1962;
(b) that his annual schedule of assignments showed him " A", (to be assigned), for September, 1962.
The Respondent respectfully suggests that contrary to the allegation contained in Paragraph 45, the Annual Schedule of Assignments, published in December for the coming year, is widely circulated and is available to all persons interested in Superior Court activities and personnel.
The Annual schedule of judicial assignments for the year 1962 indicates the assignment of judges other than Judge Brogna to all Middlesex Criminal sessions for the months of September, October, November and December, 1962.
13. (46-49) The Respondent is unable to assist the Court with reference to any of the matters contained in Paragraphs 46 through 49. He has no knowledge of any of the events or statements alleged therein.
14. (50) The Respondent admits the accuracy of the official transcript and attaches a copy hereto marked "III".
15. (51-56) The Respondent is unable to assist the Court with reference to the matters and conversations alleged in Paragraphs numbered 51 through 56 other than to state that at no time on September 27, 1962 or on any other date did he have contact in any fashion with Judge DeSaulnier, Charles or Nathan Baker or any person acting in their behalf with regard to any aspect of the Raymond case. With reference to Paragraph #54 the attention of the Court is directed to General Laws, Chapter 279, Section 1 making a probationary period a necessary adjunct to a suspended sentence.
16. (57) The Respondent admits the accuracy of the official Transcript and further informs the Court that On September 27, 1962, following the disposition of several cases, he resumed taking evidence in a trial which had commenced on September 25, 1962. That trial continued until 4:00 P.M., the close of the Court day.
17. (58) The Respondent admits the accuracy of the official Transcript marked "C" in the original Information. He further informs the Court that a reading of the statements of Attorney Bowmar and Attorney Crotty, and of Raymond, indicate a lobby conference prior to disposition.
18. (59-60) The respondent is unable to assist the Court with reference to the matters contained in Paragraphs numbered 59 and 60.
19. (61) The Respondent admits the truth of the allegation contained in Paragraph 61, and further informs the Court that the application *830 for probation transfer is dated October 9, 1962 and was approved by a Superior Court Judge other than the respondent.
20. (62-66) The Respondent is unable to assist the Court with reference to the matters alleged in Paragraphs 62 through 65, other than to inform the Court that none of those matters were officially or unofficially called to his attention at any time.
And the Respondent further respectfully informs the Court that his reading of available transcript material leaves with him an abiding conviction that his handling of the Raymond case was a proper and routine disposition.
He feels he acted in the best interest of the Commonwealth and of the parties before him, giving consideration to the victims of Raymond's swindle and placing due weight upon the recommendation of the office of the District Attorney.
He was never approached nor contacted by Judge Edward J. DeSaulnier, Jr., Charles or Nathan Baker, nor any person not legitimately connected with the matter.
 By his Attorney,
 ROBERT V. MULKERN.
*831 TRANSCRIPT "I"
Hearing in the case of Commonwealth v. Michael Raymond, Middlesex County No. 57940, September 10, 1962, Brogna, J., presiding; Joseph Neylon and John Bowers, Assistant District Attorneys, appearing for the Commonwealth; James Morelli, Esq., appearing for the defendant:
THE CLERK: 57940, Michael J. Raymond. Mr. Morelli.
MR. BOWERS: Mr. Morelli called, your Honor. He begs the Court's indulgence and says he will be here at 11 sharp.
THE CLERK: Stand.
[Other matters called and discussed.]
THE CLERK: 57960, Michael J. Raymond. Mr. Morelli.
MR. NEYLON: If your Honor please, this noontime, before the noon recess, Mr. Morelli asked me to inform the Court that it was his intention to withdraw his appearance.
MR. LAWLOR [Probation officer]: May I inform your Honor? Michael J. Raymond, this Raymond has had several attorneys. Each time his case is called he gets another attorney and he doesn't even pay up. He is a New York man. He has a new indictment coming in the September term.
MR. NEYLON: This past week.
MR. LAWLOR: Whether this is a new indictment or not I don't  He has had several attorneys and each time his case is called the attorneys withdraw or something else. It amounts to a lot of money. It is a swindle, I guess, of thousands of dollars from an elderly person.
THE COURT: Is he here?
MR. NEYLON: I haven't seen him. I have not seen him here, your Honor.
THE COURT: Call him in default and capias, and what's he under, surety bond?
THE CLERK: I might state on May 28th of '62 continued until June 8, '62, no further continuances, by order of Pecce, J.
MR. NEYLON: At that time there was a switch of attorneys.
THE COURT: Has he been notified this was on for today?
THE CLERK: Morelli has, sir. I might state there was Paul Smith, James O'Donovan, Jim Morelli.
MR. BOWERS: This has been an unusual case, your Honor.
THE CLERK: All different appearances, your Honor.
THE COURT: Has the defendant himself been notified to appear today?
MR. BOWERS: I honestly can't answer that, your Honor. I talked to Mr. Morelli. Mr. Morelli said he would notify him, but it is questionable whether he could reach Mr. Raymond.
THE COURT: You people have got an address for him?
MR. LAWLOR: We have an address in New York, your Honor.
MR. BOWERS: I think it is a bad one. Set up a date next Monday, and if he didn't show up default and capias?
THE COURT: Notify him at that address. Set up for next week. Monday is all right. If he doesn't appear, then we will default him.
MR. BOWERS: All right, your Honor, thank you.
THE CLERK: Continued until September 17.
*832 
*833 
TRANSCRIPT "III"
Hearing in the case of Commonwealth v. Michael Raymond, Middlesex County Nos. 57940 and 65677, September 27, 1962, Brogna, J., presiding; Richard G. Crotty, Esq., appearing for the defendant:
THE CLERK: 57940, 65677, Michael Raymond. Mr. Crotty.
MR. CROTTY: That case, your Honor, I request that it stand for the moment that I may confer.
THE COURT: Examination?
MR. CROTTY: Yes, your Honor.
THE CLERK: Examination.

*834 COMMONWEALTH OF MASSACHUSETTS

Supreme Judicial Court for the Commonwealth
 SUFFOLK, SS. Law No. 14927

In the Matter of

EDWARD J. DeSAULNIER, JR.

and

VINCENT R. BROGNA,

Respondents
ANSWER AND FURTHER INFORMATION OF THE RESPONDENT DeSAULNIER
To the Honorable the Justices of the Supreme Judicial Court:
Whereas on October 5, 1971, special counsel to this Honorable Court filed with the Court a certain Information designating Edward J. DeSaulnier, Jr., Justice of the Superior Court as a joint Respondent, the said Edward J. DeSaulnier, Jr., now, without waiving his "Plea to the Jurisdiction" filed herein, but expressly relying thereon, respectfully makes answer and further informs the Court as follows:
(corresponding Paragraphs in the Information are noted in parenthesis)
1. (1-6) Paragraphs 1 through 6 of the Information are true statements. This the Respondent knows of his own personal knowledge with respect to Paragraphs 1 through 3, relating to his admission to the Massachusetts Bar, and appointment to the Superior Court.
2. (7-10) Paragraphs 7 through 10 of the Information to the best of the Respondent's information and belief are true.
3. (11) The Respondent admits the general allegation of Paragraph 11, and further informs the Court that his social relationship with Nathan Baker never to his knowledge entered into his professional or judicial affairs.
4. (12-31) The Respondent, with respect to these Paragraphs, can only state that, having been provided with certain transcript material, he is aware that there has been testimony and reported interviews in which the allegations of the Paragraphs are reported. Apart from references to the docket of the Court and the official Transcript of the Court, the truth of which he does not dispute, he cannot assist the Court as to the accuracy, veracity or reliability of that testimony, other than to inform the Court that on other mccasions in the reported testimony of Michael Raymond he has made statements which are in conflict and inconsistent with the matters contained in these paragraphs.
5. (32) The Respondent respectfully differs from the part of Paragraph 32 which states that, "At all times material hereto, Mr. Crotty was an intimate social friend of Mr. Justice DeSaulnier," *835 and further informs the Court that prior to his appointment to the Superior Court his relationship was of a casual nature. After the Respondent commenced sitting in that Court and was assigned on many occasions to the Worcester Superior Court he did socialize with Attorney Crotty along with mther members of the Worcester County Bar and gradually a friendlier relationship developed. His relationship with Attorney Crotty did not, to his knowledge, have any bearing directly or indirectly on Mr. Crotty's employment as counsel to Michael Raymond, nor to any of the proceedings in that case.
6. (33-38) The Respondent, with respect to these Paragraphs, can only state that, having been provided with certain transcript material, he is aware that there has been testimony and reported interviews in which the allegations of the Paragraphs are reported. Apart from references to the docket of the Court and the official Transcript of the Court, the truth of which he does not dispute, he cannot assist the Court as to the accuracy, veracity or reliability of that testimony, other than to inform the Court that on other occasions in the reported testimony of Michael Raymond he has made statements which are in conflict and inconsistent with the matters contained in these paragraphs.
7. (39-43) The Respondent admits the accuracy of the official transcripts and court records referred to in Paragraphs 39-43, and further informs the Court that none of the matters alleged in those Paragraphs were officially or unofficially called to his attention until the summer of 1971.
8. (44) The Respondent, with respect to this Paragraph, can only state, that, having been provided with certain transcript material, he is aware that there has been testimony and reported interviews in which the allegations of the Paragraphs are reported. Apart from references to the docket of the Court and the official Transcript of the Court, the truth of which he does not dispute, he cannot assist the Court as to the accuracy, veracity or reliability of that testimony, other than to inform the Court that on other occasions in the reported testimony of Michael Raymond he has made statements which are in conflict and inconsistent with the matters contained in these paragraphs.
9. (45) The Respondent admits the truth of the matters contained in the first sentence in Paragraph 45, and further informs the Court that Judge DeSaulnier during the period June through December, 1962, was not assigned to, nor did he preside at, any criminal session in the County of Middlesex. The Respondent respectfully suggests that contrary to the allegation contained in Paragraph 45, the Annual Schedule of Assignments, published in December for the coming year, is widely circulated and is available to all persons interested in Superior Court activities and personnel.
10. (46-49) The Respondent is unable to assist the Court with reference to any of the matters contained in Paragraphs 46 through 49. *836 He has no knowledge of any of the events or statements alleged therein.
11. (50) The Respondent admits the accuracy of the official transcript.
12. (51-54) The Respondent is unable to assist the Court with reference to any of the matters contained in Paragraphs 51 through 54. He has no knowledge of any of the events or statements alleged therein.
13. (55-56) The Respondent categorically denies the truth of the statements attributed to Michael Raymond in Paragraphs 55 and 56. He further informs the Court that based upon record material furnished to him, Mr. Raymond is a several times convicted thief and swindler, and an admitted perjurer. Never during September, 1962, did the Respondent, make or receive any telephone call having to do with the Middlesex County case of Michael J. Raymond, nor was he aware that such a criminal case even existed.
14. (57-58) The Respondent admits the truth and accuracy of the official transcript referred to in Paragraphs 57-58 and is unable to assist the Court as to any of the other matters alleged in those Paragraphs.
15. (59) The Respondent denies the truth of the statements attributed to Mr. Raymond in Paragraph 59 and further informs the Court:
(a) that he has absolutely no memory of having ever met or talked to Raymond;
(b) that a review of transcript material made available to him indicates that on the first occasion that Raymond gave testimony involving the subject matter of this information he testified that following his final court appearance he "Left the courtroom, and the building and went back to New York", and that
(c) in response to this inquiry from a United States Senator, "Did you ever talk to Judge DeSaulnier after the probation in the court in Massachusetts", he replied, "I had no reason to, it was finished business."
16. (60) The Respondent cannot assist the Court with reference to the matters contained in Paragraph 60.
17. (61-64) The Respondent admits the accuracy of the official transcripts and court records referred to in Paragraphs 61-64, and further informs the Court that he had no knowledge, nor was he informed of any of the matters contained until approximately April 29, 1964.
18. (65) The Respondent admits the allegations contained in Paragraph 65 insofar as they are based on court or probation records, however, the Respondent informs the Court that the probation file reveals that:
(a) On April 29, 1968, an entry in the probation record states "Capias to issue and to be filed with the Middlesex Superior Court until such time as disposition is made of subject's case in New York".
(b) and that on July 27, 1964, Assistant United States Attorney *837 Sprizzo, New York, informed the Middlesex Probation Office that he hoped no action would be taken by any other jurisdiction against Raymond that would hinder the New York investigation.
 Respectfully submitted,
 By his attorney,
 WALTER J. HURLEY.

*838 APPENDIX B.
COMMONWEALTH OF MASSACHUSETTS SUPREME JUDICIAL COURT FOR THE COMMONWEALTH
 INFORMATION
. . . . . . . . . . . . . . . . .
 .
Edward J. DeSaulnier, Jr. .
 .
. . . . . . . . . . . . . . . . .
To The Honorable The Justices of The Supreme Judicial Court:
Edward B. Hanify and John M. Harrington, Jr., in accordance with the order of this Honorable Court dated September 8, 1971, respectfully inform the Court that:
1. Edward J. DeSaulnier, Jr. of Chelmsford, Massachusetts was admitted to the Bar of Massachusetts on April 14, 1948.
2. Edward J. DeSaulnier, Jr. was on the 23rd day of December, 1958 appointed by His Excellency, the Governor, with the advice and consent of the Executive Council, an Associate Justice of the Superior Court and on December 30, 1958 took and subscribed to the required qualifying oaths.
3. He has been an Associate Justice of the Superior Court from December 30, 1958 to the date of the filing of this Information and now holds said office.
I
4. On July 24, 1964, the Chief Justice of the Superior Court, by virtue of a vote of the Justices at the October meeting in 1926 authorizing the Chief Justice to appoint such committees as he deems advisable and to define their duties, reconstituted the committees of Justices to carry out various duties.
5. He appointed Mr. Justice DeSaulnier as one of the members of the Committee on Bail and defined its duties as follows:
"This Committee, as heretofore, is charged with the supervision of professional bondsmen and of the standing commissioners to admit persons to bail, making periodic reports as required to the Court. In addition, it is expected that the members of this Committee will keep abreast of the results from various projects and studies being made throughout the country on the question of bail and the need (or lack of need) in certain cases."
6. A copy of the material portion of said order is attached to this Information as Exhibit "A".
7. Additionally, on September 3, 1964, the Chief Justice formally appointed the Honorable Edward J. DeSaulnier, Jr. to be a member of the Committee on Bail.
*839 8. A copy of the minutes of the Superior Court with respect to said appointment and containing a copy of the letter to the Justice is attached hereto as Exhibit "B".
9. On September 11, 1964, Honorable Edward J. DeSaulnier, Jr. acknowledged formally his appointment as a member of the Committee on Bail.
10. A copy of the minutes of the Justices of the Superior Court recording said acknowledgment and setting out a copy of Justice DeSaulnier's reply is attached to this Information as Exhibit "C".
11. Nathan A. Baker of Boston petitioned on March 1, 1966 for approval and registration as a professional bondsman according to law; and his petition was approved on May 18, 1966 by the Justices of the Superior Court Committee on Bail, one of whom was Edward J. DeSaulnier, Jr.
12. A copy of certificate of approval and registration was delivered in hand to Nathan A. Baker on June 2, 1966.
13. Nathan A. Baker remained a professional bondsman until September 1, 1971 at which time his registration and approval as a professional bondsman was revoked pending further investigation of accusations pending in the Superior Court concerning his conduct as a professional bondsman.
14. At all times while Nathan A. Baker was a professional bondsman and Justice Edward J. DeSaulnier, Jr. was a member of the Bail Committee of the Superior Court, they were intimate social friends. In the course of this intimate social relationship, they frequently and regularly dined and drank together in public places; on certain occasions took trips together outside the Commonwealth, frequenting places of entertainment where they alternated in sharing expenses; and on certain occasions went together to Las Vegas, Nevada on so-called "junkets", wherein various hotels refrain from specific charges for food, drink and entertainment in the expectation that the guests will wager substantial sums of money.
15. While Nathan A. Baker was a professional bondsman and Justice Edward J. DeSaulnier, Jr. was a member of the Bail Committee of the Superior Court, Nathan A. Baker lent money to Edward J. DeSaulnier, Jr.
16. The nature of the relationship and activities connected therewith described in paragraphs 14 and 15 were such as to impair and impede, both in fact and in appearance, the capacity of said Justice Edward J. DeSaulnier, Jr. to perform impartially his duty, as a member of the Bail Committee of the Superior Court, to pass upon the qualifications or supervise the performance of the said Nathan A. Baker as professional bondsman.
II
17. During the month of November, 1970, Justice Edward J. DeSaulnier, Jr. was in charge of the session of the Superior Court in and for the County of Berkshire at Pittsfield, Massachusetts.
18. The telephone in the Judge's lobby in the Court House for the County of Berkshire at Pittsfield is number 442-1646.
19. On December 14, 1970, Justice Edward J. DeSaulnier, Jr. approved, *840 in writing, a telephone bill with respect to said telephone in the amount of $216.68, which was submitted by him to the Treasurer of Berkshire County and was paid by said County of Berkshire.
20. The said telephone bill included charges for at least 33 long-distance telephone calls which were not on any official business of the Superior Court, including 2 calls to the Frontier Hotel, 3120 Las Vegas Boulevard South, Las Vegas, Nevada, and 5 calls to the office of Nathan A. Baker and his brother, Charles, in Boston, Massachusetts.
21. A copy of said telephone bill and the approval endorsed thereon is attached to this Information as Exhibit "D".
III
22. On September 19, 1969, Edward J. DeSaulnier, Jr. of Chelmsford filed an application for a real estate broker's license with the Board of Registration of Real Estate Brokers and Salesmen accompanied by a "Real Estate Brokers Bond" signed by said Edward J. DeSaulnier, Jr., as principal, and Peerless Insurance Company, as surety, dated September 16, 1969. License No. 66684 was issued to Edward J. DeSaulnier, Jr. on September 29, 1969.
Pursuant to the Order of this Honorable Court dated September 8, 1971, the undersigned call the attention of the Court to the foregoing matters for such proceedings and action as the Court may deem meet and just in the premises.
 EDWARD B. HANIFY.
 JOHN M. HARRINGTON, JR.
EXHIBIT "A"
 July 24, 1964
 GJT/mtk
TO ALL THE JUSTICES
Effective forthwith and by virtue of a vote of the Justices at the October meeting in 1926, I hereby reconstitute the several committees of Justices to carry out the following duties.
 1. Committee on Bail
 Justice Dewing, Chairman
 Justices DeSaulnier, Sullivan, and Beaudreau.
This Committee, as heretofore, is charged with the supervision of professional bondsmen and of the standing commissioners to admit persons to bail, making periodic reports as required to the Court. In addition, it is expected that the members of this Committee will keep abreast of the results from various projects and studies being made throughout the country on the question of bail and the need (or lack of need) in certain cases.
EXHIBIT "B"
On the third day of September A.D., nineteen hundred and sixty-four, the Chief Justice appointed the Honorable Edward J. DeSaulnier, Jr., a Justice of the Superior Court, to be a member of the Committee on Bail and sent the following letter to the Justice:
*841
 September 3, 1964.
Honorable Edward J. DeSaulnier, Jr.
Justice of the Superior Court
66 Hornbeam Hill Road
Chelmsford, Massachusetts
MY DEAR JUDGE DESAULNIER:
I hereby appoint you a member of the Committee on Bail, said appointment to take effect this day.
May I have your formal acknowledgment?
 Very truly yours,
 (s) G. JOSEPH TAURO.
EXHIBIT "C"
On the eleventh day of September A.D., nineteen hundred and sixty-four, Honorable Edward J. DeSaulnier, Jr., a Justice of the Superior Court, acknowledge[d] formally his appointment as a member of the Committee on Bail and sent the following letter to the Chief Justice:
 September 11, 1964.
Honorable G. Joseph Tauro
Chief Justice of the Superior Court
Court House
Boston, Massachusetts
DEAR MR. CHIEF JUSTICE:
This will formally acknowledge my recent appointment by you to the Committee on Bail.
 Very truly yours,
 (s) EDWARD J. DESAULNIER, JR.
 EJD, Jr: F.

*842 EXHIBIT D

*843 COMMONWEALTH OF MASSACHUSETTS
Supreme Judicial Court for the Commonwealth
 SUFFOLK, SS. LAW No. 14927
In the Matter of
EDWARD J. DeSAULNIER, JR.,
Respondent
ANSWER AND FURTHER INFORMATION OF THE RESPONDENT DESAULNIER
To the Honorable the Justices of the Supreme Judicial Court:
Whereas on October 5, 1971, special Counsel to this Honorable Court filed with the Court a certain Information designating Edward J. DeSaulnier, Jr., Justice of the Superior Court as a Respondent, the said Edward J. DeSaulnier, Jr., now, without waiving his "Plea to the Jurisdiction" filed herein, but expressly relying thereon, respectfully makes answer and further informs the Court as follows:
(corresponding Paragraphs in the Information are noted in parenthesis)
1. (1-15) Paragraphs 1 through 15 of the Information are true statements to the best of the Respondent's information and belief. Respondent further informs the Court that his friendship with Nathan Baker was no more intimate than his friendship with others, including members of the bench and of the bar.
2. (16) The Respondent denies the inferences of Paragraph 16 that his friendship with Nathan Baker impaired or impeded his functioning as a member of the Bail Committee of the Superior Court and further states that no complaint against the said Nathan Baker was brought before the Bail Committee while Respondent was a member of the said Committee, nor, to Respondent's information and belief, was any complaint against the said bondsman made at any time prior to July of 1971.
3. (17) Paragraph 17 of the Information is a true statement to the Respondent's information and belief.
4. (18) Paragraph 18 of the Information is a true statement to the Respondent's information and belief. Respondent respectfully informs the Court that the said telephone is available to the clerk, the probation officer or to any person directed by the Court to make a call.
5. (19) Paragraph 19 of the Information is true to the best of Respondent's information and belief.
6. (20) Paragraph 20 of the Information is accurate and correct in that the said telephone bill includes telephone calls made by the Respondent during the time that he was assigned to sit in Berkshire County and were made by the Respondent as an ordinary incident to his being away from home on judicial assignment.

*844 7. (21) The photographic copy of the endorsed New England Telephone Company bill is accurate to the Respondent's information and belief.
8. (22) Paragraph 22 of the Information is a correct statement of fact.
 Respectfully submitted,
 By his attorney,
 WALTER J. HURLEY.
NOTES
[1] 44 Mass. L.Q. (No. 2) 33.